**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

FRED JOHNSON,

        *Plaintiff*,

v.                                                                                 Case No.  3:04-cv-342
                                                                                     Judge Thomas M. Rose

TRENT WEAVER, et al.,

        *Defendants*.

**ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,** (DOC. 25)**, AND TERMINATING CASE.**

Pending before the Court is Defendants' Motion for Summary Judgment. Doc. 25. Therein, Defendants assert that Plaintiff lacks evidence that a Constitutional violation occurred, and that, even if one did occur, Defendants are entitled to defenses under the doctrine of qualified immunity and the Eleventh Amendment to the United States Constitution. Because there is no evidence that Defendants conducted a search while trespassing on Plaintiff's property, and because the officers are qualifiedly immune from any Fourth Amendment violations they committed, and because the search warrant that issued to search the house was valid, Defendant's motion for Summary Judgment will be granted.

**A.**     **Background**

The filings of the parties draw upon what appears to be a striking paucity of discovery conducted to date.[1] As the case is before the Court on a motion for summary judgment by Defendants, the Court will draw its understanding of the factual background of the case from Plaintiff's affidavit, doc. 29-2, and those portions of Defendant Trent Weaver's affidavit, doc. 25-2, that are not contradicted by assertions in Plaintiff's affidavit for which Plaintiff would have personal knowledge.

According to Weaver, he was contacted on "October 15, 200[1]"[2] by Payne Deer Processing about a sixteen-point buck deer that was brought in for processing during bow-hunting season. The processors informed Defendant Ohio Department of Natural Resources Wildlife Officer Trent Weaver that they had processed a deer with a bullet in it. When Weaver went to the processing center, he was shown a mangled bullet and a deer from which it was said to have been extracted whose hip ball socket joint was shattered. Weaver considered the bone damage impossible for a an arrow to cause. The tag on the deer listed Jeremy MacIntosh of 10240 Carlisle Pike, Germantown, Ohio as the person who had brought the deer in. Weaver arranged with Defendant Erryl Wolgemuth[3] to meet the morning of October 16, 2001 at 7:00 a.m. at 10204 Carlisle Pike, Germantown, Ohio. Doc. 25-2 ¶¶ 3-5.

---

[1] Plaintiff informs the Court that in the five years since these events transpired, "In the instant case there has been no discovery," Doc. 29 at 2, in spite of the fact that initial disclosures were to have been exchanged under Federal Rule of Civil Procedure 26 in May of 2005 and the Court ordered the parties to complete discovery by February 15, 2006. Nearly two years were dedicated to discovery in a previously dismissed action, *Johnson v. Wolgemuth*, 3:01-cv-414 (S.D. Ohio).

[2] The affidavit implausibly lists the year as 2000, a year and a day before the visit to the deer processing center described later in this paragraph. Later the affidavit refers to events that would naturally follow this contact as occurring on October 16, 2001.

[3] Incorrectly named in the complaint as Earl Wolgemuth.

According to Plaintiff Fred Johnson, 10204 Carlisle Pike is located on his 70-acre fenced-in farm along State Rt. 123.  House number 10204, however, is not his residence, but the address of a tenant house located on his property.  The driveway to his house is one-half mile long, with a locked gate one-quarter mile from the road, where "no trespassing" signs are posted.  At the end of the drive, on one side is Johnson's house, 10232 Carlisle Pike, which is bounded on three sides by a second fence, this one made of wood, and on the fourth side by barns.  Off to another side of the end of the drive is the tenant house, 10240 Carlisle Pike. Doc. 29-2 ¶ 5.

The morning of October 16, 2001, Johnson and his girlfriend left for work in separate cars. Doc. 29-2 at ¶ 7. When they arrived at the gate on the driveway, they found it blocked by the Wildlife Officer's vehicles.  One of the officers approached Johnson and asked if he was Jeremy MacIntosh.  Johnson informed them that he was not, and that Jeremy had gone fishing and would not be back until later.  He further informed them that he "would get in touch with Jeremy and if they would call [Johnson's] automobile repair shop around noon that he would be able to talk with him." *Id.* at ¶ 9.  Johnson's affidavit continues, "I also told them that I had to get to work now.  I also told them not to go on my property and to leave my property." *Id.*

Johnson asked Weaver and Wolgemuth to move their cruisers so that he and his girlfriend could pass.  They complied, but parked again 20 to 30 feet away.  Johnson opened the gate and his girlfriend drove her car out.  Johnson, however, went to his truck and waited for the law enforcement officials to leave.  After five minutes' waiting, Johnson left his truck and walked over to Weaver and Wolgemuth, to ask what the problem was.  According to Johnson:

> Weaver and Wolgemuth, who remained in their vehicle, told me that they were going to my home to talk to Jeremy.  I again told Weaver and Wolgemuth that he was not there but if they should call my shop around noon…they could talk to him.  I also made clear that

> I needed to get to work and that I did not want them trespassing on my property especially around or in my home. When Defendants made clear that they did not care I told them I was going to get the police. They told me that they "[were] the f------ law and we didn't need anybody else." I then told them, "I will go get them then" and turned around to leave. Both Defendants were still in their vehicle when I turned around and walked towards my truck. My back was to the Defendants.
>
> When I was within a few feet of my truck I…heard Defendant Wolgemuth yell from behind me "you're going no where, you're going down you son of a b----". Before I could turn around, Defendant Wolgemuth tackled me in a bear hug trying to throw me to the ground. At one point while he was trying to throw me to the ground I told Wolgemuth I had a bad back. Defendant Weaver joined Wolgemuth, within a few steps/seconds. Defendant Weaver immediately pepper sprayed me causing me to go blind and they both tried to throw me to the ground. They continued to soak me with pepper spray in my eyes, nose and mouth. Wolgemuth may also have pepper sprayed me.
>
> After I was pepper sprayed I was blinded and was just trying to grope and to hold on to avoid a fall. Nonetheless, the Defendants continued to spray me and wrestle me. Afterwards and after I was handcuffed, Defendants purposefully delayed administering any anti spray and made no effort to clean me up for a long time and would not offer any assistance until the sheriffs arrived. Before the sheriffs arrived when I would ask for help they would taunt me and tell me to "shut the f--- up you're under arrest". I also asked for medical attention but they told me to "shut the f--- up".
>
> I did not try to hit, scratch or fight either Defendants in any way and I had no idea why I was being attacked.[4]

---

[4] Plaintiff emphasizes that "[t]he unlawful arrest and excessive force used to affect the arrest (hereinafter referred to as the 'first incident') is the subject of a separate lawsuit." Doc. 29-1 at 4. That case, *Johnson v. Woglemuth*, 3:04-cv-225 (S.D. Ohio 2004), which misspelled Officer Wolgemuth's name in the complaint, was the second action to stem from these events, the first being the action before Judge Rice that Plaintiff voluntarily dismissed. This second action, however, was dismissed with prejudice when Plaintiff repeatedly failed to provide discovery related to his asserted injuries stemming from the incident he describes. According to Johnson, "[t]he instant case addresses two subsequent matters" independent of the unlawful arrest and excessive force he describes. Doc. 29-1 at 4.

> Throughout the attack I was not told that I was being arrested or why I was being arrested. Even after I was handcuffed I still was not told why[. H]owever, as Defendants were going through my wallet one of them exclaimed, "it isn't him". I took that to mean that they then realized I was not Jeremy MacIntosh.
>
> Deputy Sheriffs arrived after all the above occurred and took custody of me to transport to the jail at Defendants' request.

Doc. 29-2 ¶¶ 13-18. Johnson was booked into jail, but bailed himself out and got back to his farm by approximately 11:00 am. Doc. 29-2 ¶ 19.

Trent Weaver's uncontradicted affidavit provides the Court with a view to the officers' meeting with Jeremy MacIntosh, who is Johnson's step-son, that transpired while Johnson was being booked on two charges of interfering with a wildlife officer and resisting a wildlife officer in violation of Ohio Rev. Code 1533.67:

> At approximately 9:45 a.m. on October 16, 2000 Officer Wolgemuth and I met with Investigator Tunnell of the Division of Wildlife. Following a discussion of the evidence gathered at that point of the investigation, we decided to attempt to contact Jeremy Mac[I]ntosh again.
>
> At 9:59 a.m., [o]n October 16, 2000, the three of us arrived at the 10240 Carlisle Pike, Germantown Ohio, the address listed on the Deer Processing Tag submitted to Payne Deer Processing by Jeremy Mac[I]ntosh and the State Form 58 Deer Harvest Form. We all walked up the lane to the house and knocked on the door. Jeremy M[acI]ntosh came to the door and voluntarily came outside of the house to talk to us. We did not have a search warrant at this time and simply were interviewing Mr. Mac[I]ntosh to find out what happened to the deer in question.
>
> Investigator Tunnell led the conversation with Jeremy Mac[I]ntosh who initially started to tell us a story of how he had killed the deer with a bow out of a tree stand toward the back of the farm. This was told while we were standing in the yard of the house but there were discrepancies and inconsistencies in the story. At this time I suggested that we take a walk so Mr. Mac[I]ntosh could take us to the scene. As we walked[,] Investigator Tunnell and Mr. Mac[I]ntosh

-5-

were talking while Officer Wolgemuth and I tagged along behind listening to the conversation and observing the farm's layout. The farther we went the more apparent it became that Mr. Mac[I]ntosh was being less than truthful. We had walked nearly to the end of the farm and Mr. Mac[I]ntosh had not yet located the deer tree stand that he had said was still there.

I spoke up at that point and confronted him about his story, and Investigator Tunnell chimed in, stating how what he had told us in the yard is not consistent with what we are being shown. Investigator Tunnell resumed the interview with Mr. Mac[I]ntosh wh[ile] we started walking toward the house along the north fencerow. Following along behind while listening[,] Officer Wolgemuth and I were scanning the area for evidence of a deer being shot. I discovered a text book scene where the 12GA slug haul was laying approximately 25 yards from a blood and deer hair spot on the grass. Approximately 15 yards beyond this was blood and deer hair where it appeared a deer had laid and bl[e]d out, possibly gutted (the gut pile was not present) and dragged streaking the blood toward the west toward their house and barns. This scene was all in a line paralleling the north fencerow in the grass strip. The shooter was in the grass strip and shooting from west to east all about 10-15 feet south of the fencerow. This location was approximately 125 yards from the house beyond the yard and a feed lot. It was on the top of a hill with almost no cover or tall crops around.

Investigator Tunnell was taking the statement from Mr. Mac[I]ntosh. I did overhear Investigator Tunnell warn Mr. Mac[I]ntosh of the penalties of giving a false statement to an Officer and that there did seem to be some discrepancies in his statement. Mr. Mac[I]ntosh did refuse to sign the first statement and then explained how Fred Johnson had in fact killed the deer here with a 12GA shotgun. Officer Tunnell then took a written statement from Mr. Mac[I]ntosh containing the information that made sense and matched the evidence we had so far. In that statement, Jeremy indicated that it had been [his step-dad][5] Mr. Johnson who killed the deer with the shotgun.

At approximately 11:10 a.m. while the three of us, all employees of the Wildlife Division and Jeremy M[a]cIntosh were standing in the field, Mr. Johnson arrived at the property racing up the lane in his white [F]ord truck. We noticed that he first went into the house, and then a short while later came out of the house and went into the barn.

---

[5] See Doc. 25-2 at 14.

> He then came driving towards us on an all terrain vehicle belligerently yelling for us to leave.

Weaver Aff., Doc. 25-2, at 22-27.

As Johnson then relates:

> … I bailed out of jail and [got] back to my farm by approximately 11 am.
>
> Defendants Weaver and Wolgemuth, now accompanied by another person (possibly Tunnell) were on my property. They were also seen in the barns near my home. When Defendant(s) looked in my direction and saw me[,] they ran. Later I went to my barns and I discovered [D]efendants[] had left their briefcase behind. I picked it up for safekeeping and went to my home to eat lunch.

Johnson Aff., Doc. 29-2 at ¶¶ 19-20.

Weaver's affidavit jibes with this description and continues to relate how their investigation carried on:

> Because of his actions earlier in the day, and based upon Jeremy M[a]cIntosh's comments that there were guns in the house, and the belligerence of the Plaintiff at that time, we decided, for our personal safety, that we should leave hastily[, w]hich we did. We had achieved our purpose of interviewing Jeremy M[a]cIntosh and observed the site of where the deer had been killed.
>
> At approximately 11:45 a.m. Officers Wolgemuth, Tunnell and [Weaver] responded to Millards Taxidermy to [c]ollect the [h]ead and antlers as evidence and to further confirm Jeremy Mac[I]ntosh's statement.[6]
>
> At approximately 2:30 p.m. Officer Wolgemuth and I went to Miamisburg Municipal Court where we met with Prosecutor Christine Burke assigned to that Court. After that conversation, Officers Wolgemuth and I filed a charge of unlawfully interfering with a Wildlife Officer, a first degree misdemeanor.

---

[6] MacIntosh's statement claims that the head was taken to Millard's Taxidermy. Doc 25-2 at 14.

> Officer Wolgemuth and I then appeared before Judge Messham of the Miamisburg Municipal Court and after advising the Court of the facts known to [us] that time regarding the potential illegal harvesting of a deer, obtained a search warrant. ...
>
> At approximately 5:00 p.m. [a]ll officers involved in the execution of the search warrant met[. T]hey are listed here: Lt. John Tannreuther from the German Township Police Department, Wildlife Officers: Brian Goldick, Ryan Peterson, Dave Warner, Erryl Wolgemuth and myself. After discussing the situation, tactics and job assignments we all proceeded together to the 10240 Carlisle Pike Germantown, Ohio address where the search warrant was executed. A search of the interior of the house was conducted, and three 12 Gauge Shotguns and seven rounds of ammunition found at that address were seized.

Weaver Aff., Doc. 25-2 at ¶¶ 28-32.

Johnson had a slightly different perspective on the search:

> At approximately 5 P.M. Defendants return[ed] to my home claiming to have a search warrant for my home[,] but it was for the address on the other side of my drive way. They would not let me in my home while they search[ed] through my belongings. They also made my live-in girlfriend stay outside. Defendants[] stayed in my home approximately one hour. After they left it was obvious that they had gone through bedroom drawers, bathroom medicine cabinets, and private areas of the home.
>
> Defendants left with only three shotguns and some shotgun shells. Before they entered my home I told them that there was a shotgun in the kitchen. The other shotguns and the shotgun shells were in the basement in a gun case openly displayed and could have been retrieved in less tha[n] five…minutes.

Johnson Aff., Doc. 29-2 ¶¶28-29.

Weaver explains:

> At the staging briefing prior to executing the search warrant, where all officers conducting the search warrant discussed what to expect, the decision was made not to allow the Plaintiff into the house during the search unless he was handcuffed. This decision was based on

> several factors. The search of the house was to be made shortly after the altercation Mr. Johnson had with Officer Wolgemuth and I, just a few hours earlier. This fact, coupled with the statements of Jeremy M[a]cIntosh that there were guns in the house, raised concerns on our part for the safety of Jeremy M[a]cIntosh and us.

Weaver Aff., Doc. 25-2 at ¶ 34. Weaver's affidavit reflects that he believed and believes that he searched 10240 Carlisle Pike. Johnson was additionally indicted on two other charges: unlawfully taking a deer with a gun outside of November 27 to December 3, in violation of Ohio Rev. Code 1531.02 and Ohio Admin. Code 1501:31-15-17(R); and unlawfully possessing a deer not properly tagged in violation of Ohio Rev. Code 1531.02 and Ohio Admin. Code 1501:31-15-11(Q). *Id.* ¶ 36.

On October 19, 2001, Johnson filed an action in United States District Court for the Southern District of Ohio, which he later dismissed in the face of a pending second motion to dismiss. *Johnson v. Wolgemuth*, 3:01-cv-414 (S.D. Ohio). On September 24, 2004, he refiled this case. A third case, *Johnson v. Woglemuth*, 3:04-cv-225 (S.D. Ohio) asserted claims of unlawful arrest and excessive force, but was dismissed for failure to prosecute.

**B.     Standard of Review**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250, 106 S. Ct. 2505 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 106 S. Ct. 1348 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324, 106 S. Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255, 106 S. Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

**C.     Analysis of First Claim**

The first count of the complaint vaguely asserts that Wolgemuth, Weaver and Tunnell "acted to deprive, interfere with, or take away from the Plaintiff rights, privileges or immunities and/or equal protection secured by the Constitution or laws of the United States." Doc. 1 ¶ 26. The next paragraph implies that the concern might be a violation of the Privileges and Immunities Clause or the Equal Protection Clause. Doc. 1 ¶ 27. The heading clarifies that the claims are under 42 U.S.C. § 1983 and the body does assert that the actions were taken under the color of law. The Ohio Department of Natural Resources Division of Wildlife is charged with maintaining a custom or policy that resulted in a depravation of Plaintiff's constitutional rights.

Claims made pursuant to 42 U.S.C. § 1983 are not subject to heightened pleading standards. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165-66, 113 S. Ct. 1160 (1993) (rejecting requirement that § 1983 complaints indicate why immunity does not apply); *Jones v. Duncan,* 840 F.2d 359 (6th Cir. 1988) (holding that § 1983 claims need not set forth in detail all the particularities of a plaintiff's claim against a defendant). Nevertheless, a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of

what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S. Ct. 992 (2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99 (1957)). While "legal theories of recovery need not be spelled out as long as the relevant issues are sufficiently implicated in the pleadings," *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004), here it is difficult to understand what Plaintiff's claims are. From the body of the complaint one can discern claims, however. See *Smith* at 577. Paragraphs 16-18 of the complaint reflect a claimed search of the property without a warrant when the officers returned around 11:00. Paragraphs 19 - 24 decry obtaining a warrant while concealing information, utilizing a search warrant insufficiently particular and an exploratory search.

Plaintiff's response to the motion for summary judgment clarifies that unlawful arrest and excessive force are not at issue. Doc. 29-1 at 4. It appears that Plaintiff is basing his claim in a Fourth Amendment violation premised on what can be construed, when reading the possible evidence in the light most favorable to the nonmoving party, as a trespass on Plaintiff's property by the wildlife officers. See Doc. 29 at 8-11.

Arguably, the Defendants committed a trespass when they returned to Johnson's property around 10:00 a.m. October 16, 2001.[7] "The interests protected by state laws regulating trespass and

---

[7] Under Ohio law:

(A) No person, without privilege to do so, shall do any of the following:

\* \* \* \* \*

(3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access[.]

the invasion of privacy, [however] and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394, 91 S. Ct. 1999, 2003 (1971). "[T]he fact that a state may have chosen to protect the property interests of its citizens by making trespass a crime under state law does not affect the analysis of a person's Fourth Amendment interest." *United States v. Hatfield*, 333 F.3d 1189, 1199 (10th Cir. 2003). Given that trespass does not create a "poisonous tree," the Court considers the officers' approach to Johnson's house and knock on the door after having been ordered not to do so.

There is no evidence that a search occurred around 11:00 a.m. October 16, 2001. Merely looking at what is already exposed to view, without disturbing it-is not a "search" for Fourth Amendment purposes. *Arizona v. Hicks*, 480 U.S. 321, 328, 107 S. Ct. 1149, 1154 (1987). Courts had long held that the police may trespass to "knock and talk." "Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (gathering cases). Here, when the officers knocked on the door, a search was not carried out.

---

Ohio Rev. Code § 2911.21. The drafting committee's comment to this law, however, notes that "Police, inspectors, and other public servants can claim that an intrusion is privileged when in the proper exercise of their duties." See also *Downs v. United States*, 522 F.2d 990, 1003 (6th Cir. 1975) (citing Restatement (Second), Torts (1965), comment (a) to s 265, at 500.) ("a law enforcement officer is privileged to commit a trespass if he is exercising his lawful authority and if he "exercise(s) it in a reasonable manner, causing no unnecessary harm.").

Any possible constitutional violation would stem from the right recognized in *Georgia v. Randolph*, 126 S. Ct. 1515 (2006), in which the Supreme Court recently held that police may not ignore the denial of consent from a person present at a residence and accept the consent of another without some justification. As *Randolph* emphasized, "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 126 S. Ct. 1515, 1518 (2006) (Citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793 (1990); and *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974)). The *Randolph* Court emphasized the narrowness of its factual application:

> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Georgia v. Randolph*, 126 S. Ct. 1515, 1527 (2006). The line is so fine that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.*

Here, arguably, "the police have removed [Johnson] the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Assuming this to be the case, however, the Wildlife Officers enjoy qualified immunity from the claim. Government officials, performing discretionary functions, are shielded from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

There is a three-part procedure for evaluating claims of qualified immunity. First, the court determines whether a constitutional violation occurred; second, the court determines whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, the court determines whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this circuit, and finally to decisions of other circuits. *Dietrich*, 167 F.3d at 1012. An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful. Rather, in light of pre-existing law, the unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely

disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This would be true notwithstanding that the trial judge found the [defendant] officer to be more credible than the plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent. *Anderson*, 483 U.S. at 639-40. See also *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus, qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson*, 483 U.S. at 639-40. Rather, the test is whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violated plaintiff's federal rights. *Id.*

While Johnson was present, he was removed from the property under arrest, arguably invalidating MacIntosh's consent with regard to the use of any items searched or seized and used

as evidence against Johnson. *Georgia v. Randolph*, 126 S. Ct. 1515, 1527 (2006). *Randoloph*, however, far from applying clearly established law, was a departure:

> All four Courts of Appeals to have considered this question have concluded that consent remains effective in the face of an express objection. See *United States v. Morning*, 64 F.3d 531, 533-36 (9th Cir. 1995); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir. 1992); *United States v. Hendrix*, 595 F.2d 883, 885 (D.C. Cir. 1979) (per curiam); *United States v. Sumlin*, 567 F.2d 684, 687-88 (6th Cir. 1977). Of the state courts that have addressed the question, the majority have reached that conclusion as well. See, e.g., *Love v. State*, 355 Ark. 334, 342, 138 S.W.3d 676, 680 (2003); *Laramie v. Hysong*, 808 P.2d 199, 203-205 (Wyo. 1991); but cf. *State v. Leach*, 113 Wash. 2d 735, 744, 782 P.2d 1035, 1040 (1989) (*en banc*) (requiring consent of all present co-occupants).

*Randolph*, 126 S. Ct. at 1527 n.1. Thus, because the wildlife officers did not violate a clearly established right, their claim to qualified immunity prevails.

Absent liability on the part of the officers, there is no need to examine the claimed pattern and practice liability of the Ohio Division of Wildlife or of the Ohio Division of Wildlife's Eleventh Amendment defense.

**D.     The Search Warrant**

Plaintiff's second claim appears aimed at the particularity of the search warrant and the officer's mistake with regard to the address. The affidavit attached to the search warrant describes the property to be searched as "10240 State Route 123 [Carlisle Pike] a 2-story Brown Brick with attached garage the house has a brown roof. House has a black cattle fence on the east, south, and west side." Doc. 25-2 at 8. An addendum to the affidavit lists the property to be seized, "arms to be seized all 12 gauge shotguns, and parts of wild animals, wild animals, that are not legally possessed." Doc. 25-2 at 9. The warrant states an intent to search the house and "all outbuildings and vehicles."

Given the alleged crime, this description is sufficiently particular. The only difficulty arising from the allegedly wrong address number being attributed to the correctly described house. The test for determining whether a search warrant describes the premises to be searched with sufficient particularity "is not whether the description is technically accurate in every detail," *United States v. Durk*, 149 F. 3d. 464, 465 (6th Cir. 1998) (citing *United States v. Prout*, 526 F.2d 380, 387-88 (5th Cir.1976), but rather whether the description is sufficient "to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched." *Id,* (citing *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir.1989)).

The description in the instant case is entirely sufficient. Any reasonable officer would find the lane by the number listed and, upon reaching the end of the lane, surmise the house to be searched was the one that was searched based upon the detailed description. This does not create a constitutional violation.

The Fourth Amendment's particularity requirement prevents the issuance of general warrants, which "create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *United States v. Savoca*, 761 F.2d 292, 298-99 (6th Cir. 1985). Therefore, a warrant that fails to conform to the particularity requirement of the Fourth Amendment is invalid. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Sixth Circuit has adopted the express incorporation rule to cure an overly broad warrant under certain circumstances. According to the incorporation doctrine, "[a] search warrant may be construed with reference to a supporting affidavit if the affidavit accompanies the warrant and the warrant incorporates the affidavit by reference." *United States v. Blakeney*, 942 F.2d 1001, 1024 (6th Cir. 1991). To be sufficiently particular, a

warrant must assure the individual whose property is searched or seized of the limits of the executing officer's power to seize.  See *Groh*, 540 U.S. at 561, 124 S. Ct. 1284.

The instant warrant clearly described what may be seized.  It limited the shot guns that may be seized to 12 gauge ones, ones that may have committed the crime they had probable cause to believe was committed.  The only other items that could have been seized were items that could have been fruits of the crime alleged.  The warrant was sufficiently particular.

Another consideration is the allegation that the officers concealed from the magistrate the fact that they interviewed Jeremy MacIntosh in violation of Fred Johnson's orders not to trespass on his property.  While a warrant could have issued on the information gathered from Payne Deer Processing, the affidavit did not mention this investigation, relying instead on Jeremy MacIntosh's statement.  Doc. 25-2 at 8.  The revelation that they were merely trespassing, however, would not have likely changed the magistrate's decision to grant the warrant.  "The interests protected by state laws regulating trespass and the invasion of privacy, [however] and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394, 91 S. Ct. 1999, 2003 (1971).  "[T]he fact that a state may have chosen to protect the property interests of its citizens by making trespass a crime under state law does not affect the analysis of a person's Fourth Amendment interest." *United States v. Hatfield*, 333 F.3d 1189, 1199 (10th Cir. 2003).

Finally, Plaintiff asserts that Defendants executed the warrant in an exploratory fashion, going beyond what was reasonable under the circumstances.  The only evidence presented to the Court is that wildlife officers conducted a one-hour search  including "bedroom drawers, medicine

cabinets and private areas of the home." Doc. 29-2 ¶28. This was reasonable under the circumstances. Moreover, these areas all fall within the ambit of the places the warrant allowed to be searched. See Doc. 25-2 at 8.

**E.  Conclusion**

Because there is no evidence that the officers "searched" while trespassing on Johnson's property, and because the officers are qualifiedly immune from any Fourth Amendment violations they committed, and because the warrant that issued to search the house was valid, Defendant's motion for Summary Judgment is **GRANTED.** The Clerk is **ORDERED** to enter judgment for Defendant on all claims. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, Friday, September 29, 2006.

                                                                                      s/Thomas M. Rose
                                                                           _____
                                                                            THOMAS M. ROSE
                                                        UNITED STATES DISTRICT JUDGE